



*Assisted Living Concepts, Inc.*

DIRECT DIAL:   262/257-8905
DIRECT FAX:   262/257-8615
Email: mzakkowalczyk@alcco.com

January 6, 2010

***SENT VIA UPS OVERNIGHT***

Ms. Brenda Garza
EEOC Dallas District Office
207 South Houston Street
Third Floor
Dallas, TX 75202

RE:   Michael J. Norton
       EEOC Charge No.: 450-2010-00253

Dear Ms. Garza:

This letter shall serve as the position statement of Respondent, Assisted Living Concepts, Inc., d/b/a Hopkins House ("Respondent"), to the Charge of Discrimination filed by Michael J. Norton ("Complainant"), in which he alleges that he was discriminated against by being discharged from his position as a Residence Sales Manager ("RSM") because of his disability status. The Respondent denies that it in any way discriminated against Complainant because of a disability, or any other reason. In addition, the information in this letter and in the exhibits constitutes the information sought by you regarding this Charge.

Hopkins House is owned and/or operated by Assisted Living Concepts, Inc., W140 N8981 Lilly Road, Menomonee Falls, Wisconsin. Hopkins House is a 52-bed assisted living residence that employs approximately 19 people and is located at 890 Camp Street, Sulphur Springs, Texas. Complainant was hired as a RSM on May 19, 2008. Please see **Exhibit A**, Job Description.

Following is Respondent's answer to the allegations outlined in Complainant's Charge of Discrimination in bold italics:

*I suffer from renal cancer. My cancer obviously substantially limits a number of major life activities like lifting and major bodily functions like urinating. I underwent surgery for renal cancer on may 22, 2009. I asked my employer for time off before this, and I expressly used the words "renal cancer" when asking the company for time off. The company gave me permission to take time off for this purpose, and I returned to work after my cancer surgery on July 1, 2009.*

*On August 4, 2009, I asked the company to take August 14 off in order to undergo surgery for a hernia. The company did not say yes or no to this. Instead, on the following date, i.e., August 5, 2009, Assisted Living Concepts fired me. The company did this by letter dated August 5, 2009 and my discharge took effect the same day. The letter gave no reason; however, Miss Cindy Giles, Regional Director of Sales and Marketing, verbally stated to me that the company was firing me because she said I was "unable to do whatever was necessary to move census forward".*

*I believe that Assisted Living Concepts, Inc., my former employer, discriminated against me by firing me because I am actually disabled and because the company regarded me as disabled, both in violation of the Americans With Disabilities Act ("ADA"), including as amended by the ADA Amendments Act of 2008 ("ADAAA"), as well as Chapter 21 of the Texas Labor Code.*

It should be noted that Complainant did not identify himself as disabled either prior to his employment or during his employment. All information received from the Complainant related to his cancer and surgery did not identify any long term effects or disability. See **Exhibit B** Email from Complainant to Cindy Giles, Rebecca Edwards and Linda Garrido, dated May 28, 2009 and **Exhibit C** Email from Complainant to Morris Sherman, Division Director of Human Resources dated June 25, 2009. There was no correspondence from a doctor stating that Complainant was in any way disabled. See **Exhibit D** Return to work slip from Complainant's physician dated June 25, 2009. Respondent denies that the Complainant has a disability or that the Respondent perceived the Complainant to be a disabled employee.

When the Complainant was hired as the Residence Sales Manager (see **Exhibit A**, Job Description) in May of 2008, the thirty apartments at Hopkins House were consistently full. Its occupancy rate had been near or at capacity for a long time. Due to the consistently high census, Hopkins House was earmarked for a 22-unit expansion project. Complainant started work on May 19, 2008 and the new addition broke ground the next day, May 20th. Complainant's essential role was to build up contacts and referral sources, to keep current occupancy rates steady, to pre-sell the new units, and to build a waiting list in anticipation of the completion of the new addition. Complainant worked for approximately 8 months prior to the February 2009 opening of the addition. In anticipation of these new units, there were in-house activities and promotions that brought the public to view the new construction. And while these activities were one of the Complainant's key responsibilities, the Complainant did not plan or participate in any of these activities, even though they were created specifically to bring in referrals and potential new residents.

During construction of the new addition, the number of residents who moved into the existing building did not meet expected standards. Complainant brought in only four (4)

ALC 0079

new residents from May 2008 to the end of December 2008. His sales activities were not maintaining the high occupancy levels that Hopkins House had consistently achieved prior to his employment. When the new addition was completed in February 2009, Complainant had no new residents signed up to move in and there was no waiting list. Complainant's performance continued to fall below expectations and there were no move-ins during March, May and June. Only two new residents moved in during the month of April.

When Complainant returned from medical leave on July 1, 2009, another intensive sales campaign was launched to build occupancy at Hopkins House. The Complainant's supervisor, Cindy Giles, advised the Complainant that his performance was not meeting expectations and that he needed to improve occupancy during July in order to keep his position with the company. To help the Complainant achieve these objectives, Complainant was required to conduct at least twenty outside sales calls per week and to participate in regular telephone conferences per week with regional staff members. The goal of these conference calls was to come up with ideas that would generate leads, identify additional referral sources and move in new residents. Complainant's supervisor, along with the Residence Director and Wellness Director at Hopkins House, participated on these conference calls. Assignments were given to each of the employees, including the Complainant, and a follow-up report was expected the next week. Complainant consistently did not follow up on the assignments he was given and the next week was not prepared to report any positive action. During July, the Complainant did not grow occupancy at Hopkins House and did not generate any significant leads. See **Exhibit E** Monday Occupancy Call Report, submitted by Complainant at the end of July, that showed zero (0) new residents, zero (0) projected move-ins and zero (0) inquiries from professional referral sources. Please note that resident names on this report have been redacted. Moreover, the occupancy at Hopkins House continued to drop.

At the end of July, Ms. Giles discussed the Complainant's continued substandard performance with her supervisors and it was determined that Complainant was not meeting the necessary goals required to be successful in the RSM position. Due to Complainant's inability to meet his sales and occupancy goals, Ms. Giles went to Hopkins House on August 5, 2009 and terminated Complainant.

It should be noted that if at any time the Complainant felt that he had been unfairly discharged, he had the option of utilizing the "Employee Complaint Resolution Procedure", described on pages 20 and 21 of Respondent's Employee Handbook, but he did not choose to do so. Please see **Exhibit F** for a copy of this Procedure.

In summary, Complainant was terminated from his position as Residence Sales Manager on August 5, 2009 because:

1. he was not producing the necessary leads to increase occupancy and fill the new addition;

ALC 0080

2. he was not following through on assignments from his supervisor;

3. the number of move-ins that the Complainant generated during his year long employment with the company was insufficient to maintain the budgeted occupancy levels for Hopkins House; and

4. the occupancy at Hopkins House actually dropped during his tenure with the company.

Respondent denies that it terminated the Complainant's with the complaint because of a disability or for any other unlawful reason. Respondent further denies that its actions violated the Americans with Disabilities Act or Chapter 21 of the Texas Labor Code. Respondent respectfully requests that Complainant Norton withdraw his Charge of Discrimination or that a finding of "no probable cause" be issued by the Commission and that Complainant's charge be dismissed.

Nevertheless, in order to resolve this matter expeditiously on a no-fault basis and without admitting any violation of law or discriminatory act, the Respondent hereby offers to settle this matter by sealing the Complainant's personnel file, subject to legal requirements, and furnishing a neutral letter of reference indicating the dates of employment and position held. The Respondent would agree to furnish only this information to any prospective employer. In return, Complainant must withdraw this Charge of Discrimination and agree to waive any and all rights he had or has or will have in the future to a position with Respondent or any of its affiliates.

If you need additional information, please direct your inquiry to the undersigned. If I am unavailable, please feel free to contact my paralegal, Lisabeth A. Richards, at 262.257.8809.

Very truly yours,

ASSISTED LIVING CONCEPTS, INC.

Mary T. Zak-Kowalczyk
Senior Corporate Counsel

MZK/lar
Enclosures

4

ALC 0081

# EXHIBIT A

## Job Description

## ASSISTED LIVING CONCEPTS, INC.

ALC 0082

# Job Description

## Community Sales Manager (multi site)
## Residence Sales Manager (single site)

## Position Summary:

Reporting to the Regional Director of Sales and Marketing, the Sales Manager is responsible for meeting and exceeding occupancy goals at the residence. Promotes a positive image and represents the residence to healthcare professionals and community networking groups and business leaders to expand the residence's referral base. Takes inquiries, gives tours, and closes sales with deposit and move in date. Gives timely and accurate information to the appropriate residence team members regarding referrals and move-ins. Follows all company policies and procedures. Requires 80% travel within territory.

## *Essential Functions* include, but are not limited to, the following:

Ability to meet and exceed sales goals.

Develops and ranks sales referral sources and completes the assigned number of quality in-person sales calls.

Generate leads and build relationships through sales contacts with local healthcare professionals and community referral sources.

Continual follow up on referrals.

Makes presentations to business and networking groups to build the sphere of influence of the residence.

Invites community groups to hold meetings etc., in the residence.

Compiles and updates as necessary market competitive analysis including shopping the competition.

Become the expert in assigned communities on senior housing.

Takes independent actions and looks for and takes advantage of opportunities to build residence reputation and increase flow of referrals.

Extraordinary ability to interact and build relationships with older adults and their influencers.

Schedules tours and meets potential residents and their families to determine needs, give tours highlighting benefits, provide solutions, overcome objections and close sales to obtain deposit and move-in date. Explains all move-in forms, disclosure statements and agreements.

Coordinates greeting of new resident, double checks on readiness of apartment.

Provide move-in and new resident information to appropriate team members.

Ability to work within approved budget.

1/5/2010  http://intranet.alcco.com/C14/HR Document Library/HR Document Library/Job Descriptions/CSM RSM  2006.doc     **ALC 0083**

Coordinates brochure ordering/collateral materials through approved marketing sources.

Prepare all required paperwork on daily, weekly, monthly basis and report to supervisor as required.

Must be action/results oriented with strong customer service skills.

Must be adaptable, teachable and flexible in tasks and on site time.

Must have exceptional time management and organizational skills.

Must be team player and have the ability to mentor and coach other residence team members on excellent customer service as it relates to meeting potential residents during tours and on site visits.

Self motivated, proactive and able to handle multiple projects simultaneously in a fast-paced environment.

In cooperation with Residence Directors and Life Enrichment Coordinators develop and implement activities designed to bring the community into the residence.

Ability to accommodate up to 80% travel within assigned communities.

Proven effectiveness at navigating professional and social networks.

High energy and stamina – focuses a high level of energy on the business and manages stress effectively.

Impeccable ethics and integrity are a must.

Follows all policies and procedures including dress code and hygiene policies.

Knows resident rights, maintains confidentiality of resident information and reports complaints to Residence Director.

Joins community networking groups as appropriate.

Performs other duties as directed by Regional Director of Sales/Marketing.

Ability to relate positively, effectively and appropriately with residents, families, community members, volunteer and other residence staff.

Possess special interest in, and a positive attitude about, working with the senior population.

Treat all employees and residents with dignity, respect and courtesy.

Take responsibility for and make every effort to resolve communication issues, concerns and problems.

Participate in building activities as required.

Implement the Corporate Marketing Team's monthly marketing strategies.

Ability to communicate and work within all levels of the company while following reporting paths.

Ability to work flexible hours to meet requirements of the job.

Maintains car in good working order and have current drivers license and auto insurance.

Meets all health requirements as required by law.

And any other duties assigned by supervisor.

## *Minimum Qualifications:*

At least three (2) years of outside sales experience, preferably in senior housing.

Demonstrated problem solving and negotiation skills with emphasis on closing the sale.

Extraordinary ability to interact and build relationships with older adults and their influencers.

Ability to adhere to assisted living principles and ALC's code of ethics.

Ability to read, write and speak and understand English coupled with excellent communication skills.

Bachelor's degree or equivalent experience.

Excellent oral and written communication skills including formal presentation skills before both small and large groups, strong interpersonal, analytical, planning and organization abilities, and be self motivated with knowledge of business concepts and issues.

---------------------------------------------------------------------------------------------------------------------

I, (print name)_____ have read the above job description and fully understand the conditions set forth therein and as Sales Manager  I will perform these duties to the best of my ability.

 I understand that the employer retains and reserves any and all rights to change, modify, amend, add to or delete from any section of this document as it deems, in its judgment, to be proper.

_____

Print Employee Name


_____

Signature of Employee


_____

Date

# EXHIBIT B

## Email from Complainant dated 5/28/09

## ASSISTED LIVING CONCEPTS, INC.

ALC 0086

**Zak-Kowalczyk, Mary**

| | |
|---|---|
| **From:** | Norton, Mike |
| **Sent:** | Thursday, May 28, 2009 1:47 AM |
| **To:** | Giles, Cindy; Garrido, Linda; Edwards, Rebecca |
| **Subject:** | Surgery |
| **Attachments:** | surgery 008.jpg |

How are my ladies? I got home today, Swollen as big as a house but glad to be here. It went well, the lymph system was sent out for pathology but Dr. Huffman says they looked normal, we will know early next week. So far then no chemo or radiation, they got it all and saved 3/4 of the kidney. I feel like hammered dog shit but expect to get better fairly quickly as the swelling subsides. There is just something wrong when I could walk in last Friday, feeling good, looking normal and wake up looking like a flying pig gorged on Obama's bucks. I'm probably going to go very wrong admitting this but I miss ya'll even the conference calls. As bad as it is from time to time we do have a kinda of dysfunctual family thing going on, I miss it. I'll update you folks as I learn anything, right now the only other thing I know is that the staples will come out on 06/08. I'll talk to you folks soon.

**See You at the Top**
**Michael Norton**
Resident Sales Manager
mnorton@alcco.com

Office 903-439-1202
Cell 903-926-6688
Fax 903-885-6697

**Hopkins House**
890 Camp Street
Sulphur Springs, TX 75482

ALC 0087

# EXHIBIT C

## Email from Complainant dated 6/25/09

## ASSISTED LIVING CONCEPTS, INC.

ALC 0088

**Zak-Kowalczyk, Mary**

| | |
|---|---|
| **From:** | Norton, Mike |
| **Sent:** | Thursday, June 25, 2009 7:04 PM |
| **To:** | Sherman, Morris |
| **Cc:** | Giles, Cindy; Bassham, Tiffany; France, Debbie |
| **Attachments:** | work_release.pdf; final_biopsy.pdf |

Morris,

Attached is my release to return to my duties on July 1st, 2009. Also attached is a copy of the Pathologist's final report which basically says three things.
1. The surgical area was clean of cancer and the margins adequate
2. There is no cancer in the adjoining lymph system
3. No cancer in the surrounding fat and organ tissue.

Other than a complete check up every 90 days for the next year no further treatment is indicated. No chemo, no radiation, no cancer drugs. I have healed well and other than building up my strengh and energy I am getting well. I'm looking forward to returning to work.

If you would make the proper notifications for me I would be grateful.

**See You at the Top**
**Michael Norton**
Resident Sales Manager
mnorton@alcco.com

Office 903-439-1202
Cell 903-926-6688
Fax 903-885-6697

**Hopkins House**
890 Camp Street
Sulphur Springs, TX 75482

1/6/2010

**ALC 0089**

# EXHIBIT D

### Doctor Return to Work Slip

### ASSISTED LIVING CONCEPTS, INC.

ALC 0090



ALC 0091

# EXHIBIT E

## Monday Occupancy Call Report

## ASSISTED LIVING CONCEPTS, INC.

ALC 0092

**Monday Occupancy Call**
**866 390 5250 #8753102**
**Required Participants: Residence Director / Sales Manager / Wellness Director**

House Name: Hopkins House

Total Occupied Apartments:
24

Occupancy Goal
__39

Move-Ins (Name/Date)
___0

Move Outs (Name/Date/Fin. End Date/Move out date ▆▆▆▆▆▆▆ on 08/28/09__30 day notice received

Net scheduled for upcoming week
_____0

Net Projection for upcoming week
____0

Review HOT Leads (Next Steps; See Lead Follow-up tool) ___I have - MJN

Number of scheduled calls and focus for the upcoming week:
RD _____10__  SM_____20__  WD _____2_____

Mystery Shop Results (if applies)
___N/A

_____STAR ANALYSIS *(Previous week)*_____

- Total outside sales calls for RD ____10_____  SM _____20___  WD
_____2_____

- % of sales calls matching STAR __100_____ (_____ / _____) *provide brief explanation for variance*

- % of sales calls to medical professional ___90

- Total sales calls vs. outcomes _____88_____ (outcomes) _____/ ___
(sc)_____

- Number of new inquires (trend from previous weeks...increase, decrease, etc) ___0 no change

**ALC 0093**

**Monday Occupancy Call**
866 390 5250  #8753102
**Required Participants: Residence Director / Sales Manager / Wellness Director**

- % of new inquiries from professional referral sources
_____0_____

- % of move-ins from professional referral sources
_____0_____

- Inquiry to Tour Conversion Ratio
_____0_____

- Tour to Move-In Conversion
Ratio_____0_____

- At Risk Residents:  Next step ███████, ███████ has been placed on
  hospice _____
- Residents in Hospital ███████_____

\*\*\* Ask yourself, "What leads did your sales calls produce last week?"
\*\*\* Be prepared to present the "why's" of the negative or positive week…what affected this?
\*\*\* Be prepared to present a plan to turn around negative trends
\*\*\* Be prepared to review sales plan and where you are with goals set on sales plan along with upcoming events

ALC 0094

# EXHIBIT F

## Pages 20 and 21 – Employee Handbook

## ASSISTED LIVING CONCEPTS, INC.

**ALC 0095**

**EMPLOYEE COMPLAINT RESOLUTION PROCEDURE (FOR NON-INTRODUCTORY EMPLOYEES)**

At some point during your employment, you may find that you disagree with the actions of your supervisor or another member of management. Whatever the nature of your concern, you have a right to raise your complaint, and have it heard. To help you do this, ALC has established this procedure for you to use.

You have the right to voice your concerns. ALC promises that there will never be any kind of retaliation against you for lodging a concern or complaint through this procedure. You have the right to appeal any decision, all the way to the president of ALC. If you need assistance in processing your complaint, you may contact your division director of human resources who will assist you in presenting your complaint under this procedure. Here is the procedure for you to follow:

**Step One:** If you have a concern or a problem regarding your work, arrange to speak with your Residence Director by making an appointment to meet privately to discuss your problem. If the Residence Director is unable to resolve your problem, he/she will respond to you in writing within five (5) work days. If you are unhappy with the Residence Director's answer, you have the right to appeal directly to the Regional Director of Operations.

**Step Two:** At this step, you have a right to appeal your problem directly to your Regional Director of Operations. If you don't know who this is, your Residence Director or your Divisional HR Director will give you this person's name, address, and telephone number. Your complaint to the Regional Director of Operations may be made in person or by telephone, but it must also be put in writing. The Regional Director of operations will work with the Division Director of Human Resources to investigate and respond to your complaint. The Regional Director of Operations will respond to you in writing within ten (10) work days of the time he/she has received your written complaint. If you are unhappy with the Regional Director of Operations' answer, you may appeal to your Divisional Vice President.

**Step Three:** At this step, you will submit your problem in writing, including all the documents you have received up to this point, directly to the Divisional Vice President. If you do not know who this person is, the Residence Director or your Divisional HR Director will provide you with the Divisional Vice President's name, address, and telephone number. The Divisional Vice President will respond to your complaint within fifteen work days of the date it is received. If you are unhappy with this person's response, you may appeal to the President of ALC.

**Step Four:** This is the final step of this procedure. You will send all papers you have received, plus copies of all of your written complaints to the President of ALC. Your Residence Director will assist you in the preparation of this appeal if you need help. The President will answer your problem in writing just as quickly as possible, and this decision will be final.

You should never wait to discuss your problem. The longer you wait to raise your concern or problem, the more difficult it may be to resolve. Although there are no specific time limits in this procedure for you to follow, you must act quickly whenever a problem arises. ALC is committed

ALC 0096

to making your employment as enjoyable as is possible. Your right to use this procedure cannot be denied. You will never be punished or fired for properly using this procedure. If any issue you raise under this procedure is the subject of a complaint or discussion with an outside agency or organization, processing of such issue under this procedure will be suspended until the discussion or complaint is resolved.

## DISCIPLINE PROCEDURE (FOR NON-INTRODUCTORY EMPLOYEES)

The safe and efficient operation of the Residence requires that all employees comply with our work rules. These rules are designed to maintain a safe and pleasant environment for residents, visitors, and staff.

The purpose of the Discipline Procedure is to correct improper employee behavior by the use of the least severe action possible, consistent with the employee's offense. Employees will be subject to disciplinary action for violations of employer work rules. The right to fair and impartial discipline does not establish any actual or implied contract of employment with the employer. All employment is at will.

Prior to imposing any disciplinary action, your supervisor will investigate to determine whether a work rule has been violated. You will ordinarily be afforded an opportunity to tell your side of the story to your supervisor before any final discipline is applied. You may be asked to provide a written statement. In serious circumstances, an employee will be suspended pending investigation. No written notice is given to an employee suspended pending investigation.

The actions available to management are specified herein. If you believe you have been unfairly disciplined, you may utilize the "Employee Complaint Resolution Procedure" provided in your handbook.

The following are the disciplinary actions for non-introductory employees, in order of severity:
1. First Notice: An initial Disciplinary Action Report outlining the improper conduct, its consequence(s), and a warning against repeated violations. A copy of this notice is recorded in the personnel file.
2. Final Notice: The final notice against work-rule violations. This is documented in the employee personnel file.
3. Discharge Warning: This severe action is your last chance and the final step before discharge and is recorded in your personnel file.
4. Discharge from Employment: This is the last step and the employee's employment is terminated.

Work rules, and the actions associated with their violations, are grouped into three (3) general categories as follows:

Class I:   These are normally lesser breaches of policy which can be simply corrected without serious disciplinary measures. Supervisors will issue a notice to employees for minor violations with an emphasis on correcting the behavior.

Class II:   These are violations which necessitate immediate disciplinary action in the form of a final written notice for the first offense. Because Class II infractions are more serious, the First Notice step is skipped.

**ALC 0097**